

# NUMBER 13-25-00012-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF L.S.R. AND C.W.R., CHILDREN

## ON APPEAL FROM THE COUNTY COURT AT LAW NO. 5
## OF NUECES COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices West and Cron
Memorandum Opinion by Justice West**

Appellant M.R. (Father) appeals a judgment terminating his parental rights to his children, L.S.R. and C.W.R.[1] Father argues that the evidence is insufficient to support (1) the statutory termination grounds, and (2) that termination was in the children's best interest. We affirm.

---

[1] To protect the identity of minor children in an appeal from an order terminating parental rights, parents and children are referred to by their initials or an alias. *See* TEX. FAM. CODE ANN. § 109.002(d).

# I. BACKGROUND

## A. Pretrial Proceedings

On March 23, 2023, the Department of Family and Protective Services (the Department) filed its original petition for conservatorship and requested termination of C.B. (Mother) and Father's parental rights to L.S.R. and C.W.R., who were five and three years old at the time of removal, respectively. The petition was accompanied by an affidavit in support of removal alleging neglectful supervision and physical abuse by Mother and Father. The affidavit alleged that the Department received reports from the children's school that L.S.R. was observed to be "dirty" with a "foul body odor" and had "roaches in her backpack [and] feces on her school folder." L.S.R. made comments to her teachers "about sleeping outside," about being hungry, and "that she goes into a[n unhoused] encampment in the woods in Flour Bluff" with her mother. The reports also indicated that L.S.R. had been observed "with strange bruising around her hips and cuts around her mouth," "bruises on her face, which were black and purple in color," and "unexplained bruising to her legs." Likewise, C.W.R. had been "observed dirty and hungry, often without shoes."

It was further reported that Father "was observed sitting on a bus bench drinking a 40[-]ounce bottle of alcohol with [C.W.R.] sitting beside him" and was "often seen carrying alcohol while [C.W.R.] [wa]s in his care." Mother was reportedly using methamphetamines and "ha[d] been observed under the influence of illicit substances when at school events or dropping [L.S.R.] off at school." The children had also "been seen walking around Flour Bluff, with their parents, in the middle of the night."

Both children were interviewed at the Children's Advocacy Center (CAC) on March 22, 2023. The affidavit alleged that L.S.R. told the CAC interviewer that "she has stayed with her mom in her mom's tent, and 'there were other things her parents told her she was not supposed to talk about.'" C.W.R. "stated her dad was mean and hurts her" and "described and demonstrated being forced to lay on her stomach and having her hands tied behind her back by a man, but then requested to end the interview."

The affidavit included the Department's previous involvement with both parents. Mother had three prior cases which resulted in removal of three of her children, and a fourth case involving Father that resulted in another child being removed. The Department also received reports involving L.S.R. and C.W.R. in September 2018, October 2020, March 2021, and September 2022. These reports included allegations that L.S.R. sustained physical injuries from Mother, Mother and Father were using methamphetamines, and Father "would drink to the point of intoxication and drive with [L.S.R.] and [C.W.R.] in the vehicle."

The trial court awarded the Department temporary managing conservatorship of L.S.R. and C.W.R. on March 27, 2023. The dismissal date for the case was set for April 4, 2024, however, the trial court extended the deadline to October 1, 2024, pursuant to Texas Family Code § 263.401. The case proceeded to a bench trial and continued for four days on September 16, 2024, November 7, 2024, December 4, 2024, and December 6, 2024.

**B.    Trial Record**

Michael Gilby, a caseworker for the Department, was assigned to this case in February 2024. Gilby testified that his communication with Father had been "sporadic."

3

Gilby said he met with Father in person twice, but Father generally would not respond to his text messages for "up to two weeks, maybe longer," and when he did respond, Father would not address his questions on "when and where [they] could meet." Gilby testified that Father is unemployed, receives "100 percent" disability, is currently incarcerated in the Nueces County Jail, and does not have a permanent residence. He testified that Mother is "living in a tent on the beach in Flour Bluff," but he "ha[s] not been able to locate her" since he started on the case.

Gilby explained that the Department's original goal was family reunification, but the recommendation changed to termination because the parents did not comply with their family service plans. Gilby testified that Mother failed to complete all of her assigned services except "some drug testing at the beginning" of the case. Father's family plan of service included "a drug and alcohol assessment, psychological assessment, parenting classes, substance abuse classes, random drug testing, . . . individual [substance abuse] counseling," a "30-day inpatient treatment program" at "Cenikor," and domestic violence prevention classes. Testimony revealed that Father completed the assessments, but did not complete the parenting classes, the domestic violence classes, the substance abuse counseling, and the Cenikor inpatient treatment program. Gilby testified that Father attempted to complete the Cenikor program in May 2024 and stayed there for over two weeks; however, he was "unsuccessfully discharged for having an unauthorized cell phone." Father also voluntarily completed two separate week-long "detox" programs at Cenikor in November 2023 and August 2024.

As to the randomized drug testing, Gilby testified that Father had two negative UA screenings early in the case, but at those same screenings, Father refused to do the

required hair follicle tests. The record indicates that out of the remaining eleven ordered tests from 2023 to 2024, Father did not complete eight and three came back positive for marijuana, amphetamine, methamphetamine, and/or cocaine.

Taite Bowers, the Department's conservatorship supervisor, testified that the Department's main concerns at the time of the children's removal were Mother's and Father's substance abuse. Bowers explained that Father last visited the children on September 11, 2023, and his visits were suspended on September 18, 2023, because he had not "initiated services." For visitation to resume, Bowers testified that Father would have to "reengage in services and complete drug testing." After the Department learned that Father was living in a sober living facility in February 2024, and Father resumed drug testing in April and June 2024, Bowers explained that it intended to recommend Father resume visitation with the children. She also explained that because Father was engaging in services again, the trial court extended the case's dismissal date to October 1, 2024. However, the Department did not recommend that visitation resume because Father was later incarcerated. Evidence showed that Father was arrested, but not charged, for "fail[ure] to ID" or intent to give false information in April 2023 and for criminal trespass in September 2023 and August 2024. Father was also arrested on December 8, 2023, and later incarcerated for the offense on October 18, 2024.[2]

Bowers testified that Father loves his children and acknowledged that Father attempted to address the Department's concerns. For example, Father completed some substance abuse counseling sessions and completed his required assessments. She also

_____

[2] It is unclear from the record why Father was incarcerated at the time of trial.

recognized that any time Father contacted the Department, he "always ask[ed] how the children were doing," and his visits with the children were generally positive because he often brought snacks and activities for them. She maintained, however, that despite Father's progress and his love for his children, she was concerned that she had seen "no behavior changes."

Court Appointed Special Advocate (CASA) Elizabeth Martin was the CASA guardian ad litem for L.S.R and C.W.R. and assigned to this case in August of 2023. Martin testified that she was unable to contact Father until March 2024. At that point, she and Father communicated "a lot," and he engaged in services. However, she explained that throughout the course of the case, Father would periodically go "MIA," and his communication with her was overall inconsistent.

Martin testified that she "was in agreement" when the court suspended Father's visitation with the children. She stated that throughout the case, there was never a point where she felt like it "was going to be psychologically beneficial for the children" to resume visitation with either parent because they "were not doing the drug tests or were not moving forward with that rehabilitation consistently." Martin said she did not support reunification because she did not see either parent "moving forward in their progress." When asked what her "biggest concern" with Father was, she responded:

> My biggest concern with [Father] is that [Father] can talk a lot about what he wants to do or what he knows to do, but holding himself accountable to those actions so that he, himself, is in a healthy, safe, and secure environment is very difficult. I have not seen that come to fruition . . . .

6

On cross examination, she stated that over the eight months she spent communicating with Father, "besides [his] words, there is not anything that has caused me to believe that the girls could be returned."

The children were placed with a foster family shortly after removal and then transferred to live with their current foster family on June 3, 2024. Gilby stated that the children "are doing great" and "have adjusted very, very well." Likewise, Bowers said the children were "doing really well" and "thriving" with the current foster family ("Mr. and Mrs. P"). She explained that "with the changes and the counseling that they've had, [the children] are exhibiting childlike behaviors . . . verses adult-like behaviors at their age." Gilby, Bowers, and Martin recommended that the children remain with Mr. and Mrs. P and that parental rights be terminated.

By the last day of trial, Father had been incarcerated in the Nueces County Jail for over a month. Father admitted that throughout the case, he had "[m]ore setbacks than successes." He admitted that some communication issues between him and the Department had to do with his "difficultly hanging on to cell phones" because he had bought sixteen cell phones in the last year and a half, and his number had changed at least two or three times over the course of the case. However, he maintained that Gulf Coast Services and the Department would give him contradictory answers as to what classes he needed to complete or had completed. He also testified that he had "a lot of trouble getting in touch with the original caseworker [before Gilby] to get services set up," and Gulf Coast was not forthcoming with what classes it offered. He maintained that these communication issues hindered his ability to complete his service plan. However, he also testified that he knew and understood all the services he needed to complete, he had the

Department's and CASA coordinator's phone number, he had the ability to reach out to the Department to ask questions about services, and he knew where the Department's office was located.

Father maintained that he had completed all his required services except for the inpatient or "residential" program at Cenikor and admitted that he continued to test positive for methamphetamines during the pendency of the case. He testified that he first went to Cenikor in October or November 2023, and he took a variety of classes that were similar to the classes that the Department had assigned for him, including parenting classes and relapse prevention classes. However, later into the program, he began experiencing pain in his back. Doctors found a cyst on one of his kidneys, and he stayed in the hospital for about a month. He testified that his hospitalization caused him to lose his place at Cenikor, lose his apartment, and use all his savings. The day after he was discharged from the hospital, he was arrested and spent over a month in jail. After his release, Father testified that he stayed in at least three different temporary living facilities. Father testified that the required classes and assessments under his service plan "were no big deal," but his physical health and the communication with the Department were his biggest hurdles.

Father testified that he was an excellent father, and he had no issues raising the children prior to their removal. He maintained that he was only previously involved with the Department because of Mother's actions, and he did not leave the children alone with her anymore. While Father acknowledged that he was currently incarcerated, he stated that he has an apartment available to him upon release, he intends to resume L.S.R.'s and C.W.R.'s counseling, and he eventually wants to "move back home to southern

8

Illinois, Kentucky area where [his] other children are" located. He explained that he has nine biological children aged five to thirty-five. He acknowledged that he never raised any of his children from the time they were born until they were eighteen.

Father called two witnesses at trial. M.S., Father's former landlord, testified that Father reached out to her about "taking placement of the children involved in [this] case." M.S. operated "a sober living community" where Father lived for about a year. M.S. said that she did not consider Father a friend but explained that she wanted to help him like any of her other former tenants. She explained that "[h]aving worked with people in recovery for a very long time, . . . recovery is not something that you can go into rehab for 30 days and come out cured." She stated that it "takes time" to recover, and she "h[as] seen an awful lot of people recover, but not in one year." She intended to take care of the children long-term so that Father could "get his life together." M.S. testified that she has only met L.S.R. briefly, and she has never met C.W.R. She testified that she had not seen L.S.R. in a long time, and she has not had any contact with the children during the pendency of the case.

M.S. was approved as a potential placement for the children around February 2024. Father explained that he wanted the children to be placed with M.S. because of "her general attitude towards family and community," and she shares his same faith. Father also believed M.S. would allow his eldest son to have a relationship with the children. Bowers testified that the Department ultimately did not place the children with M.S. because there was no previously established relationship between M.S. and the children, and the children had already bonded with their foster placement. She also

9

explained that the children were doing well in counseling, and the Department did not want to hinder the children's progress by placing them with someone new.

Carl, Father's eldest son, testified that he lived with Father and the children in the past and has seen him be "a great father to these girls." Carl testified that Father left Carl's mother when he was young because his "mother's family didn't want him in the picture," but he had no issues with Father growing up. The two reconnected when Carl was an adult, and Father helped him "get off the streets." Carl recommended Father's parental rights not be terminated, but that Father be "placed under court ordered rehab" before reuniting with the children.

The trial court signed an order terminating Father's parental rights pursuant to Texas Family Code § 161.001(b)(1)(N), (O), and (P). *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(N), (O), (P). The trial court further found that termination of Father's parental rights was in the children's best interest. *See id.* § 161.001(b)(2). This appeal ensued. *See* TEX. R. APP. P. 28.4.

## II.    SUFFICIENCY OF THE EVIDENCE

### A.    Standard of Review & Applicable Law

To terminate parental rights, a court must find two elements by clear and convincing evidence: (1) that the parent committed one of the statutory grounds for termination found in § 161.001(b)(1) of the family code; and (2) that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re*

10

*J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d 230, 232–33 (Tex. 2019) (per curiam).

"Because the natural right between a parent and his child is one of constitutional dimensions, *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985), termination proceedings must be strictly scrutinized." *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In parental termination cases, our legal and factual sufficiency standards honor this elevated burden of proof while respecting the factfinder's role. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018) (citing *In re J.F.C.*, 96 S.W.3d at 264).

"The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. In a legal sufficiency review, we "cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *Id*. at 630–31 (citing *In re J.F.C.*, 96 S.W.3d at 266). We must also consider undisputed evidence, if any, that does not support the finding. *In re K.M.L.*, 443 S.W.3d at 113; *see In re J.F.C.*, 96 S.W.3d at 266 ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence."). Thus, "[e]vidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *In re A.C.*, 560 S.W.3d at 631 (citing *In re J.F.C.*, 96 S.W.3d at 266).

Factual sufficiency, on the other hand, requires us to weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *Id.* We "must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam)). We defer to the trier of fact's determinations on the credibility of the witnesses "so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *see In re H.R.M.*, 209 S.W.3d at 108; *see also In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("A standard that focuses on whether a reasonable jury could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role.").Therefore, "[e]vidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *In re A.C.*, 560 S.W.3d at 631 (citing *In re J.F.C.*, 96 S.W.3d at 266).

**B.    Termination Grounds**

In his first issue, Father argues there is legally and factually insufficient evidence supporting each termination ground.

**1.    Predicate Finding Under Subsection (N)**

Subsection (N) provides for the termination of the parent-child relationship on grounds of constructive abandonment. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N). To prove constructive abandonment by clear and convincing evidence, the Department must establish four elements: (1) the child has been in the custody of the Department for at least six months; (2) the Department made reasonable efforts to return the child to the

12

parent; (3) the parent has not regularly visited or maintained significant contact with the child; and (4) the parent has demonstrated an inability to provide the child with a safe environment. *See id.*

### i. In the Department's Care for Longer than Six Months

The trial court awarded the Department temporary managing conservatorship of L.S.R. and C.W.R. on March 27, 2023. The children were still in the Department's care at the start of trial on September 16, 2024. Thus, L.S.R. and C.W.R were in the Department's care for longer than six months. *See id.*

### ii. Reasonable Efforts to Return the Child to the Parent

"Returning the child to the parent, per [§] 161.001(1)(N)(i), does not necessarily mean that the child has to be physically delivered" to the parent. *In re D.S.A.*, 113 S.W.3d 567, 573 (Tex. App.—Amarillo 2003, no pet.). Instead, we consider whether the record reflects reasonable efforts by the Department to return the children back to their father. *See In re F.E.N.*, 542 S.W.3d 752, 767 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("[T]he question is whether the Department made reasonable efforts, not ideal efforts.").

The Department's preparation and administration of a service plan, aimed at family reunification, satisfies this element. *See In re G.P.*, 503 S.W.3d 531, 533 (Tex. App.— Waco 2016, pet. denied) (providing that preparation and administration of service plans by the Department are reasonable efforts to reunite a parent and a child); *In re A.Q.W.*, 395 S.W.3d 285, 288 (Tex. App.—San Antonio 2013, no pet.) (same); *In re K.G.*, 350 S.W.3d 338, 354 (Tex. App.—Fort Worth 2011, pet. denied) (same).

13

The trial court heard evidence of the Department's reunification service plan for Father. Father did not complete the inpatient treatment program at Cenikor, domestic violence prevention classes, individual substance abuse counseling sessions, or maintain negative drug tests. Gilby and Martin testified that communication with Father was inconsistent because Father would disappear for weeks at a time. As Martin described:

> We would talk about where he was with things and then he would lose his phone or his phone number or something would happen and then I would be the one providing attorney contact information, [the Department] contact information, and we would kind of hop back on the train again with some new things he was going to go try or do or, you know, how we're going to follow the plan and—but that cycle would continue.

Gilby testified that he attempted to reach Father at four different addresses provided to him, but he could not locate Father at any of the addresses. Father admitted that a lack of communication with CASA and the Department was at least partially his fault because he had issues "hanging on to cell phones," and his number changed at least two or three times over the course of the case. He also admitted that throughout the case and despite the communication issues with Gulf Coast, he understood what his service plan required, he had the ability to contact the Department, and Gilby and Martin were available to him.

Therefore, a reasonable factfinder could have formed a firm conviction that the Department made reasonable efforts to return the children to Father through its uncontroverted preparation and attempted execution of the reunification service plan. *See A.D. v. Tex. Dep't of Fam. & Protective Servs.*, 673 S.W.3d 704, 714 (Tex. App.—Austin 2023, no pet.) (holding that the Department made reasonable efforts to return the child to the parent because of the existence of a service plan and testimony by the Department caseworker that he made repeated attempts to communicate with the parent); *see also*

*In re F.L.B.*, No. 13-19-00319-CV, 2019 WL 6606159, at *8 (Tex. App.—Corpus Christi–Edinburg Dec. 5, 2019, no pet.) (mem. op.).

### iii. Failure to Regularly Visit Child or Maintain Significant Contact

By the start of trial, Father had not seen his children in a year. Father impliedly argues that his absence was based on his incarceration alone which does not constitute "abandonment" of a child for purposes of termination of parental rights. *In re D.T.*, 34 S.W.3d 625, 633 (Tex. App.—Fort Worth 2000, pet. denied) ("It has long been settled that imprisonment, standing alone, does not constitute 'abandonment' of a child for purposes of termination of parental rights." (citations omitted)).

It is not clear from the record how long Father was incarcerated during the pendency of this case. For example, evidence indicates that Father was arrested on April 20, 2023, September 25, 2023, December 8, 2023, and August 5, 2024, but the evidence does not show when he was released. The record is clear, however, that Father was not incarcerated throughout the entire case, and the trial court extended the original dismissal date because Father appeared to be reengaging in services around February 2024. From February onward, evidence showed that Father's communication with the Department and CASA was sporadic and inconsistent, he failed to maintain negative drug tests, and he twice failed to complete the Cenikor program. Thus, there is no indication from the record that incarceration alone prevented Father from visiting the children. *See id.*

Moreover, Father admitted that he did not complete the inpatient program at Cenikor, and he tested positive for methamphetamine multiple times throughout the case. Thus, a reasonable factfinder could have formed a firm conviction or belief that it was within Father's ability to resume visitation and that his failure to do so was of his own

15

accord. *See In re M.R.J.M.*, 280 S.W.3d 494, 505–06 (Tex. App.—Fort Worth 2009, no pet.) (holding that there was factually sufficient evidence that father had not regularly visited or maintained significant contact with the child despite his complaints that he could not visit the child more regularly due to financial and transportation issues); *see also In re K.P.*, No. 11-20-00001-CV, 2020 WL 4038858, at *2–3 (Tex. App.—Eastland July 15, 2020, no pet.) (mem. op.) (collecting cases in which the court held the parent was not prevented from regularly visiting or maintaining significant contract with the child where failure to submit to drug testing in order to regain visits was within the parent's control).

### iv.    Inability to Provide Child with a Safe Environment

There was extensive evidence shown at trial of Father's inability to retain steady housing, to complete the in-patient treatment at Cenikor, and maintain consistent negative drug tests, and evidence of his multiple arrests throughout the duration of the case. Further at trial, Father admitted that he could not provide for the children because he was currently incarcerated, and he did not know when he was getting released.

Viewing all the evidence in the light most favorable to the trial court's (N) findings, we conclude that the trial court could have formed a firm belief that Father constructively abandoned L.S.R. and C.W.R., and the disputed evidence is not so significant that a reasonable factfinder could not form a firm belief of this finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N); *In re A.C.*, 560 S.W.3d at 634.

### 2.    Predicate Finding Under Subsection (O) and (P)

Because the evidence is legally and factually sufficient to support the predicate grounds under subsection (N), we need not address the sufficiency of the evidence

supporting the remaining grounds. *See In re N.G.*, 577 S.W.3d at 232–33; *see also In re F.L.B.*, 2019 WL 6606159, at *10. We overrule Father's first issue.

## C.     Best Interest Finding

In Father's second issue, he argues there is legally and factually insufficient evidence supporting the trial court's best interest finding.

### 1.     *Holley* Factors

There is a strong, though rebuttable, presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131(b); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In reviewing a best interest finding, we consider, among other evidence, the non-exclusive *Holley* factors. *In re E.N.C.*, 384 S.W.3d at 807 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). These factors include: (1) the child's desires; (2) the child's emotional and physical needs now and in the future; (3) any emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id.* The party seeking termination is not required to prove all nine *Holley* factors, and the absence of evidence regarding some of the factors does not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 25, 27.

## 2. Analysis

As to the first *Holley* factor, the factfinder may consider whether the child has bonded with the foster family, is well cared for by them, and has spent minimal time with her biological parent. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also In re F.L.B.*, 2019 WL 6606159, at *10. Martin testified that the children were bonding with their foster family, they were doing extremely well in their care, and she did not believe L.S.R. and C.W.R. had an emotional connection to Father. She also stated that "the girls, from the very beginning, have communicated that they know where they are is safe," and they understand Father and Mother are "their biological parents, but [they are] not who they look to for safety." Mrs. P also testified at trial and spoke about her family's connection with the children. She believed that L.S.R. and C.W.R. had bonded with her, her husband, and their two biological children. Lastly, Father had not seen the children in a year prior to trial. *See In re J.D.*, 436 S.W.3d at 111.

As to the second and third *Holley* factors, Gilby, Bowers, and Martin testified that the children's emotional and physical needs are being met with their foster family and there were no concerns that the foster family presented a current or future risk of emotional or physical damage to the children. Bowers testified that the children have exhibited specific emotional or psychological needs, and L.S.R in particular "exhibits [certain] behaviors due to her trauma." Bowers explained that the children were doing well in their counseling while living with Mr. and Mrs. P, and she explained that the Department was concerned that moving the children to be with M.S. would cause them to regress. Father admitted that he could not care for the children at this time because he was currently incarcerated. Moreover, the trial court could have concluded that Father's drug

18

use, criminal conduct, and past abuse and neglect of the children were indicative of a present or future risk of emotional or physical damage to them. *See In re A.H.*, 679 S.W.3d 817, 833 (Tex. App.—El Paso 2023, pet. denied) ("The circumstances that led to the child's removal may be considered as part of the parent's past neglect or inability to meet the child's needs."); *In re J.D.*, 436 S.W.3d at 118; *A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 714, 715 (Tex. App.—El Paso 2012, no pet.) (providing that evidence of a parent's past misconduct or neglect and the parent's current and future incarceration at the time of trial are relevant to the second and third *Holley* factors); *In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.–Dallas 2007, no pet.) (noting that the factfinder can give "great weight" to the "significant factor" of drug-related conduct by a parent).

Similarly, in evaluating the fourth *Holley* factor, the trial court could have evaluated Father's parenting abilities by looking at his past neglect or inability to meet the children's physical or emotional needs. *See In re A.H.*, 679 S.W.3d at 833 ("A parent's past neglect or inability to meet the child's physical or emotional needs may be considered when analyzing her parenting ability."). Father testified that he was an excellent father, that he had no issues raising the children prior to their removal. However, prior to removal, the children were periodically living unhoused with Mother, were observed at school hungry and dirty, and had reported potential abuse to CAC interviewers. Father had a previous case with the Department that resulted in the removal of his child, and he acknowledged that he never raised any of his other children from birth to adulthood.

Regarding the fifth, sixth, and seventh factors, the Department presented evidence that the foster placement was a stable and loving environment. Though M.S. was approved as a potential placement for the children, Bowers explained that the Department

19

did not recommend that the children be placed with M.S. because she did not have any prior relationship with the children, the children were doing well in counseling, and the children had already bonded with their foster placement. Father testified that after his release from incarceration, he planned to resume the children's counseling, had an apartment available, and eventually wanted to move back to his hometown to be closer to family. However, as mentioned supra, there was extensive evidence of Father's inability to retain steady housing, his difficultly completing the in-patient treatment at Cenikor, his difficultly maintaining consistent negative drug tests, and evidence that he was arrested multiple times throughout the duration of the case.

The eighth *Holley* factor was addressed with the evidence and testimony regarding Father's substance abuse, Department history, criminal history, current incarceration, and housing instability; and the ninth factor was addressed with Father's testimony about his health issues and his difficultly communicating with the Department.

Ultimately, the factfinder is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *In re S.L.*, 188 S.W.3d 388, 394 (Tex. App.—Dallas 2006, no pet.) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)). Here, the trial court could reasonably conclude that despite Father's contentions, he is unable to protect the children from current and future emotional and physical danger and he lacks key parenting abilities and stability. *See In re G.A.C.*, 499 S.W.3d 138, 141 (Tex. App.—Amarillo 2016, pet. denied) ("Additionally, a child's need for permanence through the establishment of a 'stable, permanent home' has been recognized as the paramount consideration in determining best interest."); *see also* TEX. FAM. CODE ANN. § 263.307(a) (providing that, in considering whether parents are willing and able to

20

provide a safe environment, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest").

Looking at all of the evidence in the light most favorable to the trial court's finding, we conclude a reasonable trier of fact could have formed a firm belief or conviction that termination was in L.S.R.'s and C.W.R.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630. Further, the evidence to the contrary was not so significant as to preclude such a finding. *See id.* at 631. We overrule Father's second issue.

### III.    CONCLUSION

The trial court's judgment is affirmed.

JON WEST
Justice

Delivered and filed on the
5th day of June, 2025.